Luis Oliver Canabal, demandante y peticionario, *v.* Comisión Estatal de Elecciones, demandada y recurrida.

*Número:* CT-2003-4          *Resuelto:* 30 de junio de 2004

*Pedro E. Ortiz Álvarez, Lourdes M. Torres Esteves, Héctor Luis Acevedo* y *Fernando Torres Ramírez*, abogados de la parte peticionaria; *Pedro A. Delgado Hernández, Luis Estrella Martínez* y *Luis R. Santini Gaudier*, abogados de la parte recurrida.

## SENTENCIA

El Hon. Luis Oliver Canabal, Alcalde del Municipio de Lares, presentó el 1ro de agosto de 2003 ante la Unidad de Radicaciones de la Comisión Estatal de Elecciones (C.E.E.) la candidatura para su reelección como alcalde por el Partido Popular Democrático (P.P.D.). No se presentó ante la C.E.E. ningún estado de situación revisado por un contador público autorizado ni copia certificada del Informe Financiero sometido ante la Oficina de Ética Gubernamental (O.E.G.), correspondiente al 2002. No había en el expediente ante la C.E.E. ningún documento que informara sobre la situación financiera del señor Oliver Canabal. Este último presentó en la Oficina de Radicaciones del P.P.D., antes del 1ro de agosto de 2003, una declaración jurada que contenía información sobre su situación financiera.

El Presidente de la C.E.E. emitió una resolución el 10 de octubre de 2003 —la cual se notificó a las partes ese mismo día— en vista de que los tres Comisionados Electo-

rales no estaban unánimemente de acuerdo sobre cómo resolver la disputa. Determinó que por no cumplir con los requisitos de ley, no se podía certificar al Hon. Luis Oliver Canabal como candidato al cargo de Alcalde por el Municipio de Lares y que el P.P.D. podía someter un candidato sustituto para ese cargo, siempre y cuando no fuera la misma persona.

El 20 de octubre de 2003 el Hon. Luis Oliver Canabal presentó ante el Tribunal Primera Instancia, Sala Superior de San Juan, un recurso para revisar la resolución que emitió el Presidente de la C.E.E. El P.P.D. hizo lo propio ese mismo día. Después de presentados todos los alegatos de las partes, el foro primario emitió una sentencia para revocar la Resolución de 10 de octubre de 2003. Resolvió que procedía certificar al Hon. Luis Oliver Canabal como aspirante al cargo de Alcalde del Municipio de Lares por el P.P.D. Entendió que el aspirante sometió a la Oficina de Radicaciones de Candidaturas del P.P.D. un estado financiero bajo juramento que contiene sustancial y esencialmente la misma información que surge del Informe Financiero de 2002 que presentó el aspirante ante la O.E.G. el 8 de agosto de 2003 a las 4:09 de la tarde.

Inconforme con lo resuelto por el Tribunal de Primera Instancia, el Comisionado Electoral del Partido Nuevo Progresista recurrió mediante *certiorari* ante el Tribunal de Apelaciones el 26 de noviembre de 2003. La C.E.E. también recurrió al Tribunal de Apelaciones para solicitar la revisión de la Sentencia que dictó el Tribunal de Primera Instancia. Pendientes ante el foro intermedio apelativo los recursos antes indicados, las partes recurridas ante el Tribunal de Apelaciones presentaron ante esta Curia un recurso de certificación. Expedimos el auto de certificación solicitado.

*Se confirma la Sentencia que emitió el Tribunal de Primera Instancia.*

Lo acordó el Tribunal y certifica la Secretaria del Tribu-

nal Supremo. El Juez Asociado Señor Hernández Denton emitió una opinión concurrente, a la cual se unieron la Jueza Presidenta Señora Naveira Merly y el Juez Asociado Señor Fuster Berlingeri. El Juez Asociado Señor Rivera Pérez emitió una opinión concurrente, a la cual se unieron los Jueces Asociados Señor Rebollo López y Señor Corrada Del Río. La Jueza Asociada Señora Fiol Matta se inhibió.

(*Fdo.*) Patricia Otón Olivieri
*Secretaria del Tribunal Supremo*

— O —

Opinión concurrente emitida por el Juez Asociado Señor Hernández Denton, a la cual se unen la Jueza Presidenta Señora Naveira Merly y el Juez Asociado Señor Fuster Berlingeri.

Por estimar que la sentencia del Tribunal de Primera Instancia es esencialmente correcta y que cualquier otra interpretación del Art. 4.001 de la Ley Electoral de Puerto Rico (Ley Electoral), 16 L.P.R.A. sec. 3151, sería sumamente restrictiva y contraria al espíritu de esta ley, suscribimos esta opinión concurrente.

I

El 10 de octubre de 2003, la Comisión Estatal de Elecciones (C.E.E.) emitió una resolución mediante la cual dictaminó que procedía la descalificación del señor Oliver Canabal como aspirante a la Alcaldía del Municipio de Lares por el Partido Popular Democrático, por lo que declaró vacante esa candidatura. El Presidente de la C.E.E. fundamentó su determinación en que para el 1ro de agosto de 2003 el señor Oliver Canabal alegadamente no había presentado un estado financiero revisado o una copia del estado financiero jurado que se presentó ante la Oficina de

Ética Gubernamental (O.E.G.), según requiere el Art. 4.001 de la Ley Electoral, *supra*.

El señor Oliver Canabal acudió prontamente al Tribunal de Primera Instancia para solicitar que se revocara ese dictamen. Por su parte, el foro de instancia declaró con lugar las solicitudes de revisión y ordenó a la C.E.E. que certificara la candidatura del señor Oliver Canabal para el cargo de Alcalde de Lares en representación del Partido Popular Democrático. El foro de instancia señaló, esencialmente, que el requisito de la Ley Electoral quedó cumplimentado oportunamente cuando el señor Oliver Canabal presentó un estado financiero jurado ante la Oficina de Radicaciones del Partido Popular Democrático antes del 1ro de agosto de 2003, debido a que ese documento contiene sustancialmente la misma información y forma que el documento que se somete ante la O.E.G. Desde el punto de vista jurídico, el Tribunal de Primera Instancia concluyó que el citado Art. 4.001 de la Ley Electoral quedó satisfecho y que esa disposición se debe interpretar de forma compatible con los valores constitucionales que se verían afectados con la interpretación restrictiva propuesta por la C.E.E. y el Partido Nuevo Progresista.

Inconformes con esa determinación, la C.E.E. y el Partido Nuevo Progresista acudieron ante el Tribunal de Apelaciones y solicitaron la revisión de la sentencia del foro de instancia. Aún pendiente el recurso ante el foro intermedio, el señor Oliver Canabal y el Partido Popular Democrático acudieron ante esta Curia mediante un recurso de certificación, conforme el Art. 3.002(e) de la Ley de la Judicatura del Estado Libre Asociado de 2003, Ley Núm. 201 de 22 de agosto de 2003. El 20 de febrero de 2004 expedimos el auto solicitado. Veamos los hechos particulares de este caso.

## II

El 19 de julio de 2003, el señor Oliver Canabal presentó ante la Oficina de Radicaciones del Partido Popular Democrático los documentos requeridos para aspirar al cargo de Alcalde por el municipio de Lares. El 31 de julio de ese año el Partido Popular Democrático certificó que la parte recurrente había cumplido con todos los requisitos de la Ley Electoral, con la reglamentación de la C.E.E. y con el Reglamento del Partido Popular Democrático. Cabe destacar que en el momento en que el señor Oliver Canabal presentó su candidatura, sometió un estado financiero juramentado al 31 de diciembre del 2002.

Posteriormente, el Comisionado Electoral del Partido Nuevo Progresista impugnó la certificación al aducir que para la fecha límite del 1ro de agosto de 2003, el señor Oliver Canabal no había presentado un estado financiero revisado o copia del informe presentado por él ante la O.E.G. Aunque el peticionario estimó que el estado financiero juramentado que presentó con su candidatura era sustancialmente igual en contenido y forma a aquel que presentó ante la O.E.G., en vista de la reclamación del Comisionado Electoral del Partido Nuevo Progresista, gestionó una copia certificada del estado financiero que había remitido a la O.E.G. para presentarlo a la C.E.E. Debemos mencionar que el 23 de julio de 2003, el señor Oliver Canabal solicitó a la O.E.G. una copia de ese estado financiero, la cual recibió el 7 de agosto de 2003.

Con este trasfondo fáctico en mente, veamos más a fondo las disposiciones de la Ley Electoral.

## III

La Ley Electoral considera como requisito fundamental para aspirar a la candidatura de un cargo electivo presen-

tar una petición de candidatura antes del 1ro de agosto del año que antecede a las elecciones generales. 16 L.P.R.A. sec. 3158(a). La falta de presentación de una candidatura dentro de este término constituye razón suficiente para que no se acepte la petición en cuestión.

Si más de una persona interesa aspirar al mismo puesto, surge la necesidad de cumplir con otra exigencia de ley, a saber, la obtención y presentación de un número específico de peticiones de endosos. 16 L.P.R.A. secs. 3158(a) y 3159. Si un candidato particular no cuenta con los endosos requeridos, la viabilidad de su aspiración queda obstaculizada y no se puede considerar favorablemente por incumplir con los estatutos que rigen el proceso electoral. *Grillasca Doménech v. C.E.E.*, 121 D.P.R. 186 (1988); *Escalona Vicenty v. C.E.E.*, 115 D.P.R. 529, 532 (1984). Por otro lado, cuando sólo existe un candidato, la ley hace un reconocimiento implícito de que ese aspirante disfruta del apoyo de su partido, por lo que no se requiere la presentación de endosos. 16 L.P.R.A. sec. 3156(b). Estos requisitos —cuyo cumplimiento se requiere por ley en determinada fecha— son de tal envergadura que no cumplirlos en la fecha dispuesta constituye un defecto fatal. Por ello, se conforman en requisitos *constitutivos* para aspirar a la candidatura de un puesto electivo.[1]

La Ley Electoral exige, además, otra serie de documentos para dar por sometida la petición del candidato, a saber, planillas de contribución sobre ingresos, un estado financiero y certificaciones negativas de deudas contributivas. 16 L.P.R.A. sec. 3151. La Ley Electoral no requiere que las copias de las planillas de contribución sobre ingresos se presenten junto a la petición de candidatura; bastará presentar evidencia de que los documentos se han solicitado al Departamento de Hacienda. 16 L.P.R.A.

---

[1] Es menester señalar que existen otros requisitos constitutivos para ocupar el puesto de alcalde. Véase el Art. 3.001 de la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. sec. 4101.

sec. 3151. Es evidente, pues, que el Art. 4.001 de la Ley Electoral, *supra, no requiere que se presenten todos los documentos al momento de presentar la candidatura.*

Los requisitos estatutarios que exigen presentar copia de las planillas sobre ingresos, certificación negativa de deuda contributiva y un estado financiero, sólo tienen el propósito de informar al público la situación económica del candidato antes de ocupar el puesto electivo y de establecer que el candidato ha cumplido con las responsabilidades, según dispuestas en otros estatutos. Una vez se hayan sometido los documentos requeridos por el citado Art. 4.001, se procederá a evaluarlos para la eventual certificación del candidato. Nótese que las exigencias del Art. 4.001 de la Ley Electoral conforman un requisito *calificativo* para el candidato, sin el cual no se puede evaluar su petición. El término para presentar los documentos, no obstante, no es jurisdiccional. Tan es así, que el 31 de julio del 2003 la C.E.E. emitió una resolución para extender el término para la presentación de las planillas de contribución sobre ingresos y el Centro de Recaudación de Ingresos Municipales. Así, es errónea la interpretación de la C.E.E. y de la opinión concurrente del Juez Asociado Señor Rivera Pérez a los efectos de que no presentar uno de los documentos requeridos por la Ley Electoral al momento de presentar una candidatura acarrea la descalificación automática como candidato. No obstante, esa no es la situación particular del caso de autos.

*Es sumamente significativo para la solución del presente caso el hecho de que el señor Oliver Canabal presentó un estado financiero juramentado el 19 de julio de 2003 ante la Oficina de Radicaciones del Partido Popular Democrático.* En su Estado de Situación, el señor Oliver Canabal declaró, en lo pertinente, que el Estado Financiero reflejaba su situación económica al 31 de diciembre de 2002. En ese documento consta un desglose de los activos, pasivos, capital neto, ingresos, gastos e ingreso neto

del señor Oliver Canabal. Ese Estado de Situación juramentado *constaba en el expediente del candidato y estuvo ahí desde antes del 1ro de agosto de 2003.* Es decir, la información financiera que se requería del aspirante constaba en su expediente desde antes del 1ro de agosto de 2003.

Debemos recalcar, además, *que el señor Oliver Canabal solicitó —desde el 23 de julio de 2003— copia del informe financiero que había presentado ante la O.E.G.* La O.E.G. reconoce que lo usual es notificarle por escrito al solicitante sobre la disponibilidad del documento; sin embargo, el señor Oliver Canabal alegó que nunca se le notificó sobre la disponibilidad de sus documentos. Al presentar su intención ante el Partido Popular Democrático, el alcalde incluyó un estado financiero jurado que contenía la misma información que se sometió ante la O.E.G. Esto demuestra interés de cumplir con lo que la Ley Electoral persigue al solicitar esos documentos: divulgar el estado financiero del aspirante.

La presentación de ese documento, unida a la presunción del cumplimiento de la ley, evidentemente movió al Secretario General del Partido Popular Democrático a certificar que el aspirante cumplió con todos los requisitos legales. Eso ocurrió el 31 de julio de 2003, por lo que no se trata, evidentemente, de una falta de diligencia. El actual alcalde, señor Oliver Canabal, solicitó oportunamente la copia de su informe a la O.E.G., sometió ante la Oficina de Radicaciones del Partido Popular Democrático otros documentos con la misma información que se encontraba en los de la O.E.G. y descansó en la apreciación autorizada del Secretario General del Partido Popular Democrático de que cumplía con todo lo que la Ley Electoral requiere. Ante indicaciones posteriores de que era necesario cumplir con la formalidad, así lo hizo en un plazo minúsculo. En efecto, la breve dilación no afectó a nadie porque no hubo primarias ni provocó que se introdujera material inexistente an-

tes del 1ro de agosto. Tampoco se puede asociar a algún interés de no divulgar, pues como mencionáramos, ya el señor Oliver Canabal había sometido unos documentos juramentados con toda la información que se le requirió. De un análisis sobre el contenido del informe que el señor Oliver Canabal presentó originalmente, y el que presentó el 8 de agosto (la copia del informe de la O.E.G.), se puede colegir fácilmente que ambos recogen, en menor o mayor detalle, el marco completo de la situación económica del señor Oliver Canabal.[2]

Podemos, pues, concluir que el objetivo de la divulgación —que estimamos es lo único que razonablemente puede adelantar el Art. 4.001 de la Ley Electoral, *supra*— se cumplió cabalmente al someterse el Estado Financiero jurado que acompañó la petición de candidatura del señor Oliver Canabal. Someter un Estado Financiero juramentado que contiene sustancialmente la misma información que el Informe Financiero de la O.E.G. fue suficiente, en el caso particular de autos, para dar por satisfecho el requisito de divulgación de información financiera y el cumplimiento sustancial de los requisitos que exige el Art. 4.001 de la Ley Electoral, *supra*.

La realidad es que no se trata de un término fatal o jurisdiccional, por lo que resulta sumamente sorprendente —tomando en consideración que con respecto a las planillas de contribución sobre ingresos y el Centro de Recaudación de Ingresos Municipales se concedieron prórrogas— que con respecto al estado financiero, el cual estimamos tiene un valor informativo menor, la visión administrativa se torne tan inexplicablemente rígida.

Nos sorprende, además, la decisión de la C.E.E. en el caso de epígrafe ya que en 1999, en un caso similar al de

---

[2] Esto también se deduce de un estudio comparativo que efectuó el CPA Pedro A. Galarza y la declaración jurada que suscribió el 4 de noviembre de 2003. En síntesis, el señor Galarza, Contador Público Autorizado, afirmó que el estado de situación firmado y el Informe Financiero de la Oficina de Ética Gubernamental contienen la misma información financiera, pero expuesta de forma diferente.

marras, ese organismo aplicó flexiblemente las normas que hoy nos ocupan y aceptó tres candidaturas que en ese momento se cuestionaban. Véase CEE-RS-99-007. En particular, nos atañe la situación de una de las peticionarias, la Sra. Diana M. Hernández Ferrer. Su pertinencia al caso de autos es tan contundente que transcribiremos textualmente lo que se señaló en esa resolución.

> La tramitación del caso de la aspirante Diana M. Hernández Ferrer es igualmente censurable: La aspirante también pospuso para el último momento la radicación de su candidatura. El día 2 de agosto el PPD certificó a la CEE que ésta había cumplido con todos los requisitos incluyendo la documentación requerida para ser candidata. Sin embargo, una vez la Secretaría de la CEE examinó dicho expediente constató que en lugar de *un informe financiero revisado*, tal como exige la ley, la aspirante lo que radicó fue *un informe compilado*. Confrontada con esta situación *la aspirante radicó un informe revisado el 5 de agosto; tres (3) días después de vencido el término para la radicación de candidaturas.* (Énfasis suplido.) Solicitud de certificación, pág. 15.

A pesar de la evidente diferencia entre el estado financiero sometido por la señora Hernández Ferrer y el requerido por la ley, la C.E.E. aceptó su candidatura. Entre los fundamentos para esa determinación, la C.E.E. destacó que "las disposiciones de la Ley Electoral que afectan los candidatos tienen un efecto correlativo sobre los electores. Particularmente en lo tocante al derecho del elector a emitir su voto en forma significativa y a tener la opción de seleccionar candidatos que representen las distintas visiones y programas". Posteriormente, la resolución señala que "dadas las circunstancias que rodean estos tres casos, en dos de los cuales los aspirantes son candidatos *únicos,* estaríamos restringiendo sumamente el voto si ese voto sólo puede emitirse por una lista parcial de candidatos y no por tod[o]s los que aspiren a figurar en la contienda". (Énfasis suplido.)

El caso del señor Oliver Canabal es aún más contun-

dente que el de la señora Hernández Ferrer, ya que entre el informe que éste presentó junto con su candidatura y el de la O.E.G. no había ninguna diferencia sustancial. No entendemos, pues, cómo la C.E.E. y algunos miembros de este Tribunal pueden llegar a una conclusión tan restrictiva y limitada de la Ley Electoral en el caso de marras. Esa conclusión socava, no sólo el propósito que inspiró la creación de esa ley, sino además el derecho inquebrantable que tiene todo ciudadano a expresarse democráticamente. Cabe recordar que el señor Oliver Canabal es el *único* candidato para la Alcaldía de Lares por uno de los principales partidos políticos del país. De haber acogido la tesis de la C.E.E., este Tribunal hubiese, en efecto, restringido el derecho de los electores en la medida en que se limitan incuestionablemente las opciones de éstos para ejercer su derecho al voto. No podemos permitir semejante injusticia.

Nuestros dictámenes no deben impedir que un sector de nuestra sociedad se exprese en las urnas por un mero tecnicismo, ni deben ser irrazonables o contrarios a los postulados democráticos que caracterizan a este Pueblo. Nuestra labor como último eslabón en la Rama Judicial es impartir justicia con el más estricto sentido de razonabilidad.

Para resumir, estamos de acuerdo con el sentir del Tribunal por estimar que el señor Oliver Canabal cumplió con los requisitos de la Ley Electoral para los aspirantes a puestos electivos, por lo que confirmamos la determinación del Tribunal de Primera Instancia. Por ende, procede que se ordene a la C.E.E. a que certifique la candidatura del señor Oliver Canabal para el cargo de Alcalde de Lares.

— O —

Opinión concurrente emitida por el Juez Asociado Señor Rivera Pérez, a la que se unen los Jueces Asociados Señor Rebollo López y Señor Corrada Del Río.

¿Procede que la Comisión Estatal de Elecciones certifique a un aspirante a la reelección como alcalde de un municipio cuando éste incumplió con el término y requisito de presentar en la sede de esa dependencia de gobierno a las doce del mediodía del 1ro de agosto de 2003 su estado de situación financiera revisado al 31 de diciembre de 2002, o en la alternativa, una copia de su Informe Financiero de 2002 presentado ante la Oficina de Ética Gubernamental (O.E.G.)? ¿Es tal término y requisito esencial? ¿Está obligada la Comisión Estatal de Elecciones a no aceptar ni presentar la nominación si el aspirante incumple tal término y requisito? ¿Es tal término y requisito de cumplimiento estricto o de naturaleza jurisdiccional? Esas son las interrogantes que tiene esta Curia en el presente caso.

I·

El Hon. Luis Oliver Canabal, Alcalde del Municipio de Lares (Alcalde), presentó el 1ro de agosto de 2003 ante la Comisión Estatal de Elecciones (C.E.E.) la candidatura para su reelección en esa posición por el Partido Popular Democrático (P.P.D.). Posteriormente, el 19 de agosto de 2003, el Secretario de la C.E.E., señor Ramón M. Jiménez Fuentes, circuló una comunicación a los miembros de ese cuerpo, junto con copia del Informe Financiero de 2002 del Hon. Luis Oliver Canabal presentado como Alcalde del Municipio de Lares ante la O.E.G. y recibida en la Unidad de Radicaciones de la C.E.E. el 8 de agosto de 2003. El asunto se discutió en una reunión de la C.E.E. celebrada el 20 de agosto de 2003. Durante esa reunión, el Comisionado Electoral del P.P.D., licenciado Carlos J. López Feliciano soli-

citó un término para reaccionar. El Comisionado Electoral del Partido Nuevo Progresista (Comisionado Electoral del P.N.P.), Lcdo. Thomas Rivera Schatz, y el Comisionado Electoral del Partido Independentista Puertorriqueño (Comisionado Electoral del P.I.P.), Lcdo. Juan Dalmau Ramírez, coincidieron en que la presentación del Informe Financiero de la O.E.G. ante la C.E.E. se hizo fuera de término. Se le concedió al Comisionado Electoral del P.P.D. hasta el 26 de agosto de 2003 para presentar al Presidente de la C.E.E. su posición por escrito, y éste lo hizo dentro del término concedido. El 28 de agosto de 2003 presentó, además, copia del expediente del referido aspirante a reelección, según obra en la Oficina de Radicaciones de Candidaturas del P.P.D., para que se uniera al expediente del asunto pendiente ante la C.E.E. El Comisionado Electoral del P.N.P. replicó por escrito el 29 de agosto de 2003 a la posición del Comisionado Electoral del P.P.D.

La C.E.E. examinó el expediente del referido aspirante a la reelección, que contiene documentos relacionados con su candidatura y que se presentaron en la C.E.E. De ese expediente la C.E.E. consideró lo siguiente:

1) El expediente de la candidatura del señor Oliver Canabal se presentó el 1ro de agosto de 2003 ante la Unidad de Radicaciones de la Comisión Estatal de Elecciones.

2) Al someterse dicho expediente no se presentó ningún estado de situación revisado que fuera suscrito por un Contador Público Autorizado. Tampoco se sometió copia del Informe Financiero que fuera sometido ante la Oficina de Ética Gubernamental. *Es decir, cuando se presentó el expediente ante la Unidad de Radicaciones de la CEE, no había ningún documento que informara sobre la situación financiera del señor Oliver Canabal.*

3) Al momento de la radicación, no surge evidencia alguna del expediente de que una copia del Informe Financiero de la Oficina de Ética Gubernamental hubiera sido debidamente solicitada en dicha Oficina.

4) *El 8 de agosto de 2003, a las 4:09 PM se radicó en la Unidad de Radicaciones de la CEE copia del Informe Financiero de Funcionarios y Empleados Públicos de la Rama Ejecutiva del Sr. Luis Oliver Caníbal[,] certificado dicho Informe*

*por la Oficina de Ética Gubernamental. La certificación hecha*
*por la OEG tiene fecha de 23 de julio de 2003.* (Énfasis
suplido.) Apéndice de la Solicitud de certificación, pág. 115.

El Comisionado Electoral del P.P.D. arguyó ante la
C.E.E. que la O.E.G. le proveyó al Hon. Luis Oliver Cana-
bal una copia certificada de su Informe Financiero de 2002
el 8 de agosto de 2003. Sostuvo que por ese motivo no lo
presentó ante la C.E.E. hasta el 8 de agosto de 2003. La
C.E.E., con el propósito de evaluar en toda su amplitud la
controversia que tenía ante sí, le envió una carta a la
O.E.G. el 9 de septiembre de 2003 para solicitarle que cer-
tificara de forma oficial el procedimiento que utilizó esa
dependencia para expedir y entregar copias certificadas de
los informes financieros presentados ante esa dependencia
de gobierno. Le solicitó, además, que emitiera una certifi-
cación oficial sobre cuál había sido el trámite seguido ante
la solicitud del referido aspirante de copia certificada de su
Informe Financiero de 2002, cuándo se certificó la copia de
ese documento y la fecha en que se le entregó. El Director
Ejecutivo de la O.E.G. emitió una certificación dirigida a la
C.E.E. el 18 de septiembre de 2003 mediante la que esta-
bleció el procedimiento pautado por esa dependencia para
la expedición y entrega de copias certificadas de los infor-
mes financieros solicitados por los servidores públicos.
Puntualizó en ese documento lo siguiente:

"El procedimiento para la expedición y entrega de informes
financieros a los servidores públicos o ex servidores públicos
que rinden éstos, se describe a continuación:
    1) Se recibe la solicitud de copia del informe financiero.
La misma debe ser por escrito, dirigida al Director Ejecutivo
de la OEG y firmada por el servidor o ex servidor público (pe-
ticionario) que rindió el informe financiero. Se puede adelan-
tar la solicitud vía fax. La OEG ha preparado un modelo de
solicitud de copia para conveniencia de la parte peticionaria,
sin perjuicio de que la persona opte por redactar una
comunicación.
    2) La solicitud se remite al Área de Auditoria de Informes

Financieros para su registro en el sistema de correspondencia. Luego del registro se remite al auditor o especialista que tiene a cargo la agencia ejecutiva donde labora el servidor o ex servidor público. Es entonces que el auditor o especialista prepara la copia simple del informe financiero.

3) Se le prepara una comunicación al peticionario indicándole la disponibilidad de la copia y el trámite para recibirla.

4) Una vez el peticionario se presenta a la OEG y muestra una identificación con foto[,] se procede con la entrega.

5) En caso de que el peticionario envíe a otra persona a recoger la copia del informe financiero, ésta debe traer consigo una carta donde conste la autorización del peticionario y[,] a su vez[,] deberá presentar una identificación con foto." Apéndice de la Solicitud de certificación, pág. 116.

Sobre la situación específica de la solicitud, expedición y entrega de la copia certificada del Informe Financiero de 2002 del referido aspirante, el Director Ejecutivo de la O.E.G. certificó que el 23 de julio de 2003 se recibió una llamada en esa dependencia de gobierno para inquirir sobre el procedimiento para solicitar copia certificada del Informe Financiero de 2002 que presentó el aspirante. Expresó que se orientó a esa persona sobre una solicitud que tenía que presentar por escrito y que el funcionario o persona debidamente autorizada por él debía pasar por la O.E.G. a recoger la copia certificada del documento. Certificó que el mismo día —23 de julio de 2003— se expidió una copia certificada del Informe Financiero de 2002 del aspirante. El 7 de agosto de 2003 se recibió una carta con fecha de 6 de agosto de 2003 del aspirante en la cual solicitaba que se le entregara una copia certificada de su Informe Financiero de 2002. Ese mismo día, a las 3:20 de la tarde, se le entregó al aspirante la copia certificada emitida el 23 de julio de 2003, la cual presentó en la C.E.E. el 8 de agosto de 2003 a las 4:09 de la tarde.

El Hon. Aurelio Gracia Morales, Presidente de la C.E.E., emitió una resolución el 10 de octubre de 2003 —que se notificó a las partes ese mismo día— en vista de

que los tres Comisionados Electorales no estaban de acuerdo en forma unánime sobre la forma de resolver la disputa. Determinó que al no cumplir con los requisitos de ley, no se podía certificar al Hon. Luis Oliver Canabal como candidato al cargo de Alcalde por el Municipio de Lares y que el P.P.D. podía someter un candidato sustituto para ese cargo. Aclaró que ese nuevo candidato no podría ser el propio señor Oliver Canabal. Concluyó que éste estaba descalificado para ser candidato. Sostuvo que el proceso de presentación de candidaturas electivas conlleva el cumplimiento estricto con los términos y documentos que exige el estatuto. Concluyó que como el señor Oliver Canabal no cumplió con esos requisitos y no demostró justa causa para ello, esto impidió que lo certificaran como candidato para ese puesto electivo.

El 14 de octubre de 2003 el Hon. Luis Oliver Canabal y el P.P.D. presentaron ante la C.E.E. una moción de reconsideración a la Resolución que se emitió, descalificándolo como candidato a Alcalde del Municipio de Lares por el P.P.D., la cual se declaró no ha lugar el 20 de octubre de 2003, y se le notificó con copia a las partes ese mismo día.

El 20 de octubre de 2003 el Hon. Luis Oliver Canabal presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, un recurso para revisar la Resolución que emitió el Presidente de la C.E.E. El P.P.D. hizo lo propio ese mismo día. El 27 de octubre de 2003 la C.E.E. presentó un escrito de oposición. El Comisionado Electoral del P.N.P. presentó su escrito de oposición el 31 de octubre de 2003. La Hon. Olivette Sagebién Raffo, juez superior, emitió una sentencia el 20 de noviembre de 2003 para archivar en autos una copia de su notificación a las partes ese mismo día y revocar la resolución recurrida que emitió el Presidente de la C.E.E. Resolvió que era procedente certificar al Hon. Luis Oliver Canabal como aspirante al cargo de Alcalde del Municipio de Lares por el P.P.D. Entendió que el aspirante había sometido a la Oficina de Radicacio-

nes de Candidaturas del P.P.D. un estado financiero bajo juramento que contiene sustancial y esencialmente la misma información que surge del Informe Financiero de 2002 presentado por el aspirante ante la O.E.G. Concluyó, además, que no sólo el aspirante solicitó esa copia certificada a la O.E.G., previo al vencimiento del término fijado por ley para presentar ese documento ante la C.E.E., sino que se presentó información equivalente ante la Oficina de Radicaciones de Candidaturas del P.P.D., por lo que entendió que el aspirante había cumplido con el término dispuesto por ley. Puntualizó que el hecho de excluir del proceso electoral un aspirante a candidato por no acreditar una gestión o no presentar ante la C.E.E. en determinado momento un informe financiero cuya información ya obra en el expediente de la Oficina de Radicaciones de Candidaturas del P.P.D. por vía de otro documento, no adelanta un interés gubernamental apremiante que amerite su exclusión como candidato a un puesto electivo.[1] Entendió que la omisión de presentar ante la C.E.E. el Informe Financiero de 2002 de O.E.G. el 1ro de agosto de 2003, no constituyó un incumplimiento de tal naturaleza que afecte el curso adecuado del proceso electoral, por lo que la interpretación restrictiva que la C.E.E. le impartió al estatuto no le pareció razonable.

El 26 de noviembre de 2003 recurrió mediante *certiorari* ante el Tribunal de Apelaciones el Comisionado Electoral del P.N.P. para revisar la sentencia que dictó el Tribunal de Primera Instancia. Señaló como errores que el Tribunal de Primera Instancia cometió los siguientes:

A.   Erró el Tribunal de Primera Instancia al no decretar la inexistencia de justa causa para incumplir con el requisito dispuesto en el Artículo 4.001 de la Ley Electoral de Puerto Rico[.]

---

[1] Evaluó la validez constitucional del estatuto en cuestión. Aplicó un escrutinio constitucional estricto al así hacerlo. No obstante, ninguna de las partes cuestionó la constitucionalidad del estatuto.

B.    Erró el Tribunal de Primera Instancia al determinar que las formalidades requeridas en el Artí[c]ulo 4.001 de la Ley Electoral son meramente informativas, por lo que su incumplimiento es subsanable mediante el ofrecimiento de documentos similares pero que no cumplen con todo el rigor exigido en dicho articulado.

C.    Erró el Tribunal de Primera Instancia al adoptar lo resuelto por la CEE en *Edgardo Arlequín Vélez, Diana M. Hernández Ferrer y otros v. CEE, CEE-RS-99-007*[,] por ser claramente distinguible a la situación fáctica planteada.

D.    Erró el Tribunal de Primera Instancia al omitir información oficial de la C.E.E. que revela que ni tan siquiera en la Oficina de Radicaciones del PPD se present[aron,] antes del término requerido, documentos financieros de Oliver que cumplieran con los requisitos de ley.

E.    Una vez evidenciad[a] la improcedencia de certificar a Oliver, erró el Tribunal de Primera Instancia al no resolver que nuestro ordenamiento jurídico electoral no provee la sustitución de una persona que nunca se convirtió en candidato. Apéndice de la Solicitud de certificación, pág. 480.

El 1ro de diciembre de 2003 la C.E.E. recurrió mediante *certiorari* al Tribunal de Apelaciones para revisar la sentencia que dictó el Tribunal de Primera Instancia. Señaló como errores del Tribunal de Primera Instancia los siguientes:

A.    Erró el TPI al ordenar la certificación de Oliver como candidato a la Alcaldía de Lares por el PPD no obstante el injustificado incumplimiento con los requisitos aplicables a la formalización de la candidatura.

B.    Erró el TPI al determinar que Oliver cumplió con la ley al someter un documento distinto al que requiere la Ley Electoral y el Reglamento de Candidaturas.

C.    Erró el TPI al resolver que las oficinas de radicación de los partidos políticos son lo mismo que la CEE.

D.    Erró el TPI al aplicar escrutinio estricto en este caso. Apéndice de la Solicitud de certificación, pág. 60.

Pendientes ante el Tribunal de Apelaciones los recursos de *certiorari* antes indicados, las partes recurridas, Hon. Luis Oliver Canabal y el P.P.D., presentaron ante esta Curia un recurso de certificación. El 20 de febrero de 2004 expedimos el auto de certificación solicitado y le concedi-

mos un término simultáneo a las partes para presentar sus alegatos.

El 9 de marzo de 2004 el Comisionado Electoral del P.N.P. presentó su alegato. Destacó como imperativo que las consecuencias jurídicas, de sostenerse la Sentencia del Tribunal de Primera Instancia, constituiría el menoscabo de la certeza de los trabajos de la C.E.E. Cuestiona la determinación judicial del Tribunal de Primera Instancia, a los efectos de que los documentos financieros de aspirantes a candidaturas son puramente informativos. Alega que el estatuto dispone expresamente que tal requisito es esencial. Sostiene que los hechos de este caso revelan un craso incumplimiento por un incumbente, aspirante a ser reelecto como Alcalde del Municipio de Lares por el P.P.D. que conoce el proceso y no cuenta con razones o justificación para no presentar el 1ro de agosto de 2003 el documento requerido por la Ley Electoral. Sostiene que el Comisionado Electoral del P.P.D. no podía acreditar, en la reunión celebrada por la C.E.E. para discutir el asunto, que en la Oficina de Radicaciones de Candidaturas del P.P.D. existía un expediente completo que cumpliera con los requisitos de ley. Puntualiza que la minuta de esa reunión revela que del expediente oficial de la C.E.E. no surgía la declaración jurada con el estado financiero aludido. Transcribió en su escrito la página número siete de la referida minuta, que recoge el alegado reconocimiento del Comisionado Electoral del P.P.D. a los efectos que no se cumplieron con los requisitos de ley. El contenido de la minuta, según transcrita, dispone de la forma siguiente:

"El Comisionado Rivera declara que en la página dos (2) párrafo segundo, en lo referente a "Incidentes previo a la radicación" dice que: "Surge del expediente del aspirante Oliver Canabal en la Unidad de Radicaciones de Candidaturas del P.P.D. el 19 de julio que éste radicó su candidatura junto a ciertos documentos requeridos por ley."

El Comisionado Rivera cita que: "entregó un estado de situación financiera preparado por un Contador y juramentado por él ante Notario Público *en lo que gestionaba copia de su*

*último informe financiero en la Oficina de [É]tica Guberna-*
*mental lo que solicitó el 23 de julio de 2003." Expresa que del*
*expediente no surge dicho estado de situación financiera. In-*
*dica que no hay documento alguno de esa naturaleza*
*juramenad[o] ante Notario ni preparado por un Contador.*
    *El Comisionado López afirma que eso es correcto, pues eso se*
*retuvo en la Oficina de Radicaciones del PPD porque no cum-*
*plía con los requisitos de ley ...."* (Énfasis suplido.) Alegato del
Comisionado Electoral del P.N.P., pág. 11.

Hizo alusión, además, al Art. 162 del Reglamento del
P.P.D., que dispone lo siguiente:

Todo aspirante a puestos electivos internos o en primarias o
elecciones electorales generales deberá presentar *ante la Se-*
*cretaría General los siguientes documentos*:
    1.  *Toda la documentación exigida por ley en caso de pues-*
*tos electivos al amparo de las leyes electorales.* (Énfasis
suplido.) Alegato del Comisionado Electoral del P.N.P., pág. 11.

Sostiene que los requisitos de ley a que hace alusión el
Reglamento del P.P.D. incluye el estado de situación revi-
sado o, en su defecto, el Informe Financiero de la O.E.G.
Distingue el presente caso de precedentes, producto de ca-
sos anteriores. Arguye que la ausencia de justa causa y el
incumplimiento son atribuibles al propio señor Oliver Ca-
nabal y no a la Oficina de Radicaciones de Candidaturas de
su partido político. Sostiene que el principio de la igualdad
electoral no se extiende a obviar el no cumplir con la ley,
sino en imponer reglas iguales a todos los partidos
políticos.

La parte aquí peticionaria presentó su alegato ante nos
el 11 de marzo de 2004. Arguye que el Hon. Luis Oliver
Canabal presentó una declaración jurada sobre su estado
financiero ante la Oficina de Radicaciones de Candidatu-
ras del P.P.D. el 19 de julio de 2003. El Secretario General
de ese partido político, Lcdo. Fernando Torres Ramírez cer-
tificó el 31 de julio de 2003 su candidatura y concluyó que
había cumplido con todos los requisitos de ley y de los re-
glamentos aplicables. Sostiene que el Presidente de la

C.E.E. erró al concluir que la Oficina de Radicaciones de Candidaturas del P.P.D. no era parte de la C.E.E. y al impartirle una interpretación rigurosa a un requisito de forma. Sostiene, además, como correcto lo que resolvió el Tribunal de Primera Instancia a los efectos de que la Oficina de Radicaciones de Candidaturas del P.P.D. sí es parte de la C.E.E. Arguye que al haberse presentado en esa oficina del P.P.D. desde el 19 de julio de 2003 una declaración jurada que incluía un estado financiero que se suplementó ante la C.E.E. con copia del Informe Financiero de 2002 de la O.E.G. el 8 de agosto de 2003, se cumplió con los requisitos de la Ley Electoral de Puerto Rico, por cumplirse cabalmente con la sustancia de ellos. Describe el requisito de ley en cuestión como informativo y no de naturaleza constitutiva o calificativa.

El 15 de marzo de 2004 la C.E.E. presentó su alegato ante nos. Arguye que el término y requisito de formalización de candidatura con los que no cumplió el señor Oliver Canabal es de fácil cumplimiento. Sostiene que responde a intereses legítimos, es razonable y, como tal, debió acatarse y cumplirse en este caso, así como cumplieron otros muchos aspirantes a candidaturas electivas. Puntualiza sobre las consecuencias de abrir las puertas para que, sin razón y causa justificada, los aspirantes a candidaturas electivas cumplan o sometan a su arbitrio, cuando les parezca, ante la C.E.E. los requisitos y documentos que exige la ley para formalizar la candidatura a la que aspiran. Considera como error fundamental del Tribunal de Primera Instancia no evaluar este asunto sobre la base de la clara disposición estatutaria aplicable. Arguye que sin tener el señor Oliver Canabal razón alguna para justificar su demora en cumplir al 1ro de agosto de 2003 con el referido requisito estatutario, cambió el enfoque de su caso y optó por alegar que sometió información financiera a la Oficina de Radicaciones de Candidaturas del P.P.D. equivalente a la requerida por ley para ser presentada ante la C.E.E. antes del 1ro de

agosto de 2003, y que esa oficina del P.P.D. es una extensión de la C.E.E., a los efectos del propósito del estatuto. Sostiene que a base de esos argumentos el aspirante evadió justificar su incumplimiento. Expresa que el efecto neto de lo que resolvió el Tribunal de Primera Instancia es que una declaración jurada que contenga información financiera es igual a un estado financiero revisado por un contador público autorizado o a un Informe Financiero presentado ante la O.E.G., y que la Oficina de Radicaciones de Candidaturas de un partido político es igual, equivalente o lo mismo que la Unidad de Radicaciones de Candidaturas de la C.E.E. Sostiene vehementemente que ambas premisas son equivocadas y que no deben sostenerse como cuestión de derecho. Expresa que de mantenerse lo resuelto por el Tribunal de Primera Instancia, las consecuencias sobre el proceso electoral serían funestas, ya que la C.E.E. perdería el poder de supervisión del proceso, pasándolo a manos de los partidos políticos. Afirma que colocaría el proceso de presentación de candidaturas bajo el poder absoluto de los partidos políticos, convirtiendo a la C.E.E. en un mero recibidor de documentos, sin facultad para examinar y aceptar o rechazarlos. Sostiene que la Sentencia del Tribunal de Primera Instancia contraviene la visión que expuso la Comisión Especial para la Revisión del Proceso Electoral de Puerto Rico de 1982, cuyas recomendaciones se incorporaron en la reforma electoral de 1983 y para la cual la C.E.E., como organismo rector del proceso electoral, debe de funcionar libre de ataduras partidistas, con autonomía en sus funciones y con eficiencia y balance en su administración.

## II

La Ley Electoral de Puerto Rico dispone sobre los mecanismos a seguir en procesos eleccionarios. Provee para el proceso de candidaturas, define sus principios esenciales y

prescribe los pasos a seguir para figurar como candidato en un evento electoral.

El Art. 4.001 de la ley Electoral de Puerto Rico([2]) dispone lo siguiente:

Las disposiciones a continuación constituirán los principios esenciales de toda candidatura.

(a) Todo aspirante a una candidatura *deberá radicar en la Comisión su estado de situación revisado al 31 de diciembre anterior al de la fecha de radicación y bajo juramento, junto con el juramento de aceptación de la nominación para figurar en una elección. Aquellos aspirantes que hallan tenido la obligación de rendir un informe financiero a[n]te la Oficina de Ética Gubernamental, podrán radicar copia del mismo en sustitución del estado de situación revisado. La Comisión no aceptará ni radio [sic] la nominación si el aspirante incumpliere esta disposición.* El estado de situación o informe de ética gubernamental deben ir acompañado de una copia certificada de las planillas de contribución sobre ingresos rendidas en los últimos cinco (5) años, así como de una certificación del Secretario de Hacienda en que haga constar el cumplimiento por parte del candidato de la obligación de rendir su planilla de contribución sobre ingresos en los últimos diez (10) años y las deudas existentes, si alguna, por dicho concepto, y de tener una deuda, que se ha acogido a un plan de pago y está cumpliendo con el mismo. El Secretario del Departamento de Hacienda expedirá tales copias y certificaciones libre de cargos. Además, deberá certificar toda deuda contributiva, si alguna, al Estado Libre Asociado de Puerto Rico o sus gobiernos municipales por concepto de contribuciones sobre la propiedad inmueble sobre caudales relictos. De no ser recibidas tales certificaciones al momento de la radicación, podrán sustituirse con evidencia de que tales certificaciones han sido debidamente solicitadas. *La Comisión no aceptará ni radicará la nominación si el aspirante incumpliere esta disposición. La Comisión establecerá mediante reglamento el contenido mínimo de los estados de situación y dispondrá lo relativo a la información relacionada con el cumplimiento de la responsabilidad contributiva. En todos los casos el estado de situación revisado deb[e] ser al 31 de diciembre del año anterior al año en que se celebren las primarias.*

*Todo candidato que resultare electo en la elección general deb[e] radicar en la Comisión un informe auditado previo a su*

---

([2]) 16 L.P.R.A. sec. 3151.

*certificación como candidato electo. La Comisión no certificará a ningún candidato que no cumpla con la radicación del informe auditado.* (Énfasis suplido.)

El Art. 4.008-A de la Ley Electoral de Puerto Rico(³) dispone lo siguiente:

*Fecha para abrir candidaturas y fechas límites*
La Comisión y los partidos abrirán el proceso de radicación de candidaturas *el día primero de junio del año anterior al de elecciones generales. Las fechas límites que aplicarán a los varios procesos y actividades relacionadas con dichas candidaturas y primarias serán como sigue*:
(a) *Se podrán radicar candidaturas para todos los puestos públicos sujetos a elección general hasta el día primero de agosto del año que antecede a las elecciones generales. En caso de radicar un número de candidatos exacto o menor a los puestos objetos de nominación por este partido, luego de cumplir con los otros requisitos de este título, los mismos quedarán certificados automáticamente como los candidatos oficiales de dicho partido y no tendrán que radicar peticiones de primarias.*

.   .   .   .   .   .   .   .   .

(f) *La hora límite aplicable a todos los casos será las 12:00 del mediodía; Disponiéndose, que cuando alguna de dichas fechas cayere en día no laborable, la misma se correrá al siguiente día laborable.*
Los *candidatos y aspirantes a candidaturas* deberán radicar informes de ingresos y gastos en la Comisión en las fechas que se disponen en la sec. 3117 de este título, *y los estados de situación requeridos se regirán por l[o] dispuesto en la sec. 3151 de este título.* (Énfasis suplido.)

La Sec. 3.5 del Reglamento para los Procesos de Radicación de Candidaturas y las Primarias de los Partidos Políticos(⁴) dispone lo siguiente:

*Radicación de Candidaturas*
Se abrirán las candidaturas para todos los puestos públicos sujetos a elección general no más tarde del 1ro de junio del año

---

(³) 16 L.P.R.A. sec. 3158a(a) y (f).

(⁴) Sec. 3.5 del Reglamento para los Procesos de Radicación de Candidaturas y las Primarias de los Partidos Políticos de 29 de mayo de 2003, Comisión Estatal de Elecciones, págs. 16–17.

anterior al que hayan de celebrarse las elecciones generales. *Los aspirantes deberán radicar en la Comisión y en las oficinas de los partidos políticos a los cuales pertenecen, los documentos necesarios para la radicación de las candidaturas no más tarde del mediodía (12:00 m) del 1ro de agosto del año anterior al que hayan de celebrarse las elecciones generales.* En caso de radicar un número de aspirantes a candidatos exacto o menor a los puestos objeto de nominación por ese partido político, luego de cumplir con los otros requisitos de la "Ley Electoral de Puerto Rico" y sus reglamentos, los mismos quedarán certificados automáticamente como los candidatos oficiales de dicho partido político y no tendrán que radicar peticiones de primarias. De igual forma, si luego de iniciado el proceso de radicación de peticiones de endoso en una candidatura por razón de retiro, renuncia, descalificación o muerte de los otros aspirantes, quedare un solo aspirante, éste no tendrá que completar la radicación de peticiones de primarias. (Énfasis suplido.)

La Sec. 3.14 del Reglamento para los Procesos de Radicación de Candidaturas y las Primarias de los Partidos Políticos[5] dispone lo siguiente:

*Requisitos de los Aspirantes en Primarias*
Podrán participar como aspirantes en una primaria de un partido político los que cumplan con los siguientes requisitos:

. . . . . . . .

4. *Cumplir con los requisitos exigidos por el partido político en sus reglamentos, siempre y cuando los mismos no estén en conflicto con la "Ley Electoral de Puerto Rico" o este Reglamento.*

. . . . . . . .

6. Cumplir con todos los requisitos establecidos en el Art. 4.001 de la Ley Electoral vigente, según enmendada.
   a. Radicar conjuntamente con la intención de candidatura: *Un estado de situación revisado por un Contador Público Autorizado (C.P.A.), reflejando la situación financiera al 31 de diciembre anterior al de la fecha de radicación y juramento por el aspirante, haciendo constar que la información contenida en el mismo es correcta. El Estado de Situación, deberá contener la estampilla o sello original del Colegio de Contadores Públicos Autorizados, la firma en original del Contador Público,*

---

[5] Sec. 3.14 del Reglamento para los Procesos de Radicación de Candidaturas y las Primarias de los Partidos Políticos, *supra*, págs. 26–28.

*número de licencia y fecha de expiración de la misma. Aquellos aspirantes que hayan tenido la obligación de rendir un informe financiero ante la Oficina de Ética Gubernamental, podrán radicar copia del mismo en sustitución del estado de situación revisado. La Comisión no aceptará ni radicará la nominación si el aspirante incumpliere esta disposición.*

b. Copias de Planillas de Contribución sobre Ingresos de los últimos cinco (5) años certificadas por el Departamento de Hacienda.

c. Certificación del Departamento de Hacienda de que ha rendido planillas de contribución sobre ingresos en los últimos diez (10) años y las deudas existentes si alguna por dicho concepto; y de tener deuda que se ha acogido a un plan de pagos y está cumpliendo con el mismo. Si no ha rendido planillas de contribución sobre ingresos en algún año, deberá incluir una Declaración Jurada explicando la razón. Esta certificación será libre de costo si el aspirante somete con su solicitud copia de la Notificación de Intención de Candidatura juramentada.

d. Certificación de Hacienda de deuda por concepto de caudales relictos (herencia y donaciones).

e. Certificación de deudas de contribuciones sobre la propiedad inmueble y mueble, cuando sea procedente, del CRIM.

De no tener a mano las certificaciones "c", "d" y "e" al momento de la radicación original, podrán sustituirse éstos con evidencia de que tales certificaciones han sido debidamente solicitadas. (Énfasis suplido.)

La C.E.E., mediante resolución de su Presidente, concluyó que sin duda alguna el Informe Financiero de 2002 que rindió el aspirante a la O.E.G. lo presentó ante la C.E.E. fuera del término dispuesto por ley. El aspirante tenía hasta las doce del mediodía de 1ro de agosto de 2003 para hacerlo. El informe se presentó ante la C.E.E. el 8 de agosto de 2003 a las 4:09 de la tarde. El Presidente de la C.E.E. determinó que el aspirante no presentó justificación o excusa razonable para la demora en la presentación de copia de su Informe Financiero de 2002. Concluyó que con un mínimo de diligencia el documento se pudo haber recogido en la O.E.G. y presentado en la C.E.E. con suficiente anticipación a la fecha y hora límites que establece la Ley Electoral de Puerto Rico. Concluyó, además, que tal incumplimiento conllevaba que la C.E.E., por mandato de ley, no

aceptara la candidatura del aspirante y, por ende, no lo certificara como tal. El Presidente de la C.E.E. aclaró que ese mismo curso de acción se tomó en casos de otros aspirantes, en circunstancias similares. Por una situación idéntica —someter copia de un estado financiero el 12 de agosto de 2003— se procedió a rechazar la aspiración de la Sra. María Escalera Casanova como candidata a Alcalde del Municipio de Loíza por el P.P.D. Sostuvo ambas decisiones en lo resuelto y pautado por este Tribunal en *Escalona Vicenty v. C.E.E.*, 115 D.P.R. 529 (1984), y en *P.R.P. v. E.L.A.*, 115 D.P.R. 631 (1984), entre otros.

En *Escalona Vicenty v. C.E.E.*, supra, págs. 531–532, expresamos lo siguiente:

> Su petición se basa en un análisis dual originado en el texto del Art. 4.013 de la Ley.[6] Esta disposición, en lo pertinente, concede a la Comisión diez (10) días para evaluar, rechazar y devolver a cualquier aspirante toda papeleta, bajo apercibimiento de estimarse aceptada. Primeramente alega que las 196 peticiones devueltas por la Comisión quedaron validadas automáticamente al no habérselas remitido dentro de 10 días de ser presentadas. En segundo término, argumenta, que por igual razón, las restantes papeletas, inclusive las 2,219 presentadas *tardíamente*, también quedaron aceptadas al no ser

---

[6] Este artículo dispone:

"El Presidente[,] en unión al Comisionado Electoral del partido concernido, pasará juicio sobre la validez de las Peticiones de Primarias presentadas. Tendrán hasta las doce (12) del mediodía del décimo día natural siguiente a la radicación de una petición para evaluar y rechazar la misma mediante devolución al aspirante. Toda petición no rechazada dentro de dicho término se tendrá por aceptada y tendrá que acreditársele al aspirante que la radicó.

"Durante los últimos quince (15) días del período de radicación, si la devolución de peticiones afectara la certificación del aspirante, éste tendrá un período de diez (10) días desde la devolución para sustituir las peticiones devueltas.

"Las razones para rechazar una petición serán las siguientes:

"(a)   Que el peticionario no es un elector afiliado al partido del candidato, o no es elector de ese precinto; o

"(b)   Que la petición está incompleta; o

"(c)   Que el peticionario ya ejerció su derecho de petición con otro aspirante al mismo cargo; o

"(d)   Que el peticionario agotó su derecho de petición para todos los candidatos a que tiene derecho en su precinto. El Presidente expedirá una certificación de los aspirantes, que habiendo completado los requisitos necesarios figurarán en la papeleta correspondiente." (Énfasis suplido.)

objetadas. Finaliza su ruego exponiendo que al quedar valida-
das todas esas peticiones procedía que la Comisión lo
certificara.

*No tiene razón. La tesis del peticionario Escalona Vicenty de
que existe un deber ministerial de la Comisión en certificarle
como aspirante, debido al automatismo adjudicativo prescrito
en el Art. 4.013, no es correcta.*

Ciertamente la ley decreta ipso jure válida toda petición que
la Comisión no devuelva dentro del término de 10 días. Sin
embargo, la aplicación de ese precepto inexorablemente tiene
que descansar sobre la premisa de que tales peticiones han
sido radicadas en la Comisión a tiempo, en este caso, en o
antes del mediodía del 17 de abril de 1984. No podemos soste-
ner una convalidación jurídica innecesaria de papeletas que
ab initio no cumplan con la ley. *Resolvemos que para que opere
el automatismo del Art. 4.013 es "condictio juris" la radicación
a tiempo de las papeletas.*

El peticionario Escalona Vicenty no cumplió con lo dispuesto
en el Art. 4.009(a). *Sólo presentó algunas peticiones de prima-
rias a tiempo. Las otras 2,219 las llevó por la tarde, ya vencido
el término.* Sobre estas últimas no opera el precepto de ley. La
Comisión no venía obligada a observar el término de 10 días
del Art. 4.013 para rechazarlas. (Énfasis suplido.)

En *P.R.P. v. E.L.A.*, supra, pág. 636, expresamos lo si-
guiente:

A poco profundicemos, hemos de percibir que en su diná-
mica operacional, parte sustancial de toda la Ley Electoral
—por la naturaleza inherente del proceso reglado— corres-
ponde a un mandato legislativo plasmado estatutariamente
mediante una exposición detallada de trámites y eventos de
carácter mecánico. *Esa minuciosidad de pasos a observarse,
procesos a seguirse, términos a cumplirse, documentos y demás
requisitos, son típicos de toda reglamentación legal en materia
electoral. Por ello no puede minimizarse su importancia y eva-
luación jurídica.* (Énfasis suplido.)

## III

*Nuestro deber, dentro de la forma republicana del go-
bierno, se circunscribe a interpretar la ley y despejar las
lagunas que existan en ésta, utilizando como guía la inten-
ción del legislador.* En *Alejandro Rivera v. E.L.A.*, 140

D.P.R. 538, 545 (1996), nos expresamos al respecto de la manera siguiente:

> Además, nos señala R.E. Bernier y J.A. Cuevas Segarra, en su obra *Aprobación e interpretación de las leyes de Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. I, pág. 299, que "[b]ajo un sistema de separación de poderes como el que funciona en Puerto Rico, la Asamblea Legislativa tiene la facultad de aprobar las leyes. El Poder Judicial ejercitado por los tribunales consiste en el ejercicio de las facultades de resolver los litigios a través de la interpretación de la ley. En el desempeño normal de sus funciones, los tribunales están obligados a respetar la voluntad legislativa aunque los magistrados discrepen personalmente de la sabiduría de los actos legislativos. Interpretar una ley en forma que sea contraria a la intención del legislador implica la usurpación por la rama judicial de las prerrogativas de la rama legislativa. Por tanto, el intérprete debe abstenerse de sustituir el criterio legislativo por sus propios conceptos de lo justo, razonable y deseable".

Es norma reiterada de hermenéutica que la letra clara de una ley es la mejor expresión de su espíritu.[7] A esos efectos, el Art. 14 del Código Civil de Puerto Rico[8] dispone que "[c]uando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Este precepto estatutario reconoce que la ley está sujeta a ser interpretada, pero limita la interpretación a lo que claramente surja de su texto.

El Art. 19 de Código Civil de Puerto Rico[9] reconoce que el espíritu de la ley, reflejado en la intención legislativa, es la mejor herramienta para encontrar el verdadero sentido de una ley. Como mencionáramos anteriormente, el ejercicio de la interpretación estatutaria está limitado por varias reglas de deferencia y abstención de parte de la Rama Judicial. El tribunal tiene que buscar la voluntad del

---

[7] *Santiago v. Supte. Policía de P.R.*, 151 D.P.R. 511 (2000); *Alejandro Rivera v. E.L.A.*, supra; *Meléndez v. Tribunal Superior*, 90 D.P.R. 656 (1964).

[8] 31 L.P.R.A. sec. 14.

[9] 31 L.P.R.A. sec. 19.

legislador.([10]) El espíritu de la ley juega un papel fundamental en la interpretación de un estatuto. *La intención del legislador al aprobar una ley es tan importante que hemos establecido que si la letra clara de una ley* —claramente establecida en el historial legislativo— *está en contraposición con su espíritu, prevalecerá este último.*([11]) Por otro lado, hemos resuelto que la función de los tribunales es la de interpretar la ley y no juzgar la sabiduría del legislador al aprobarla.([12])

En el caso *Clínica Juliá v. Sec. de Hacienda*, 76 D.P.R. 509, 521 (1954),([13]) expresamos lo siguiente:

> El juez es un intérprete, y no un creador. *Su facultad de interpretación adquiere relevancia cuando del estatuto surgen varios significados probables que suministren un margen adecuado para selección judicial, pero si el lenguaje es tan inequívoco que postula un solo significado, un sentido cabal de humildad y autodisciplina judicial requiere la aplicación de la voluntad legislativa.* (Énfasis suplido.)

Siguiendo esta misma línea, nos expresamos en el caso *Meléndez v. Tribunal Superior*, 90 D.P.R. 656, 661–662 (1964),([14]) de la manera siguiente:

> En *Parrilla v. Loíza Sugar Company*, 49 D.P.R. 597, 600 (1936), expusimos que "La regla de estricta hermenéutica no exige ni puede justificar que se elimine mediante legislación judicial cualquier parte de una ley, no importa cuál pueda ser la opinión del tribunal respecto a la conveniencia de la misma". Creemos justificado añadir que cuando los términos de un estatuto son claros y susceptibles de una interpretación inequívoca según el significado común y corriente de sus palabras y su construcción gramatical, bajo la misma regla tam-

---

([10]) *Alejandro Rivera v. E.L.A.*, supra.

([11]) *Sucn. Álvarez v. Srio. de Justicia*, 150 D.P.R. 252 (2000); *Pueblo v. Zayas Rodríguez*, 147 D.P.R. 530 (1999); *Figueroa v. Díaz*, 75 D.P.R. 163 (1953).

([12]) *Alonso García v. S.L.G.*, 155 D.P.R. 91 (2001); *Famania v. Corp. Azucarera de P.R.*, 113 D.P.R. 654 (1982).

([13]) Véase, además, *Srio. del Trabajo v. G.P. Inds., Inc.*, 153 D.P.R. 223 (2001).

([14]) Véase, además, *Martínez v. Rodríguez*, 160 D.P.R. 145 (2003).

poco debemos intercalar palabras ni suplir omisiones al interpretar[l]o.

El principio de deferencia a la voluntad legislativa es tal que se ha resuelto que una omisión por inadvertencia del legislador no puede ser curada mediante fíat judicial. La doctrina del *casus omissus*, adoptada por esta Curia en *Andrades v. Pizza Hut Mgt. Corp.*, 140 D.P.R. 950 (1996), nos lo impide. En este caso([15]) nos expresamos de la manera siguiente, citando a Bernier y Cuevas Segarra:([16])

> *Es una regla de hermenéutica legal que las omisiones del legislador no pueden ser curadas por los tribunales. Esa es la regla general tal como es expuesta corrientemente por los tribunales y se refiere a los casos en que el lenguaje del estatuto ha omitido algo que tampoco está dentro del propósito del mismo, pero que es claro de su lectura integral que fue omitido por inadvertencia. La razón de la regla es que el tribunal sólo interpreta y no legisla. ...*
>
> La regla se ha expresado en la siguiente forma: Al interpretar un estatuto, la intención legislativa debe ser buscada en el lenguaje usado en él con la ayuda que permiten las reglas de hermenéutica legal. *Pero un lenguaje nuevo o una disposición enteramente nueva no se puede leer en el estatuto para darle un significado que no está incluido en él. Aunque el tribunal puede interpretar frases oscuras y dudosas para darle efecto a la presunta intención del legislador y llevar a cabo los propósitos de la ley; no se puede por interpretación curar un casus omissus, no importa lo justo y deseable que pueda parecer. Meléndez v. Tribunal Superior*, 90 D.P.R. 656, 662 (1964) (Ramírez). (Énfasis suplido y en el original.)

Utilizando las reglas de hermenéutica antes esbozadas, pasemos a interpretar las disposiciones estatutarias y reglamentarias en cuestión.

Ninguna de las partes cuestionó ante el Tribunal de Primera Instancia, el Tribunal de Apelaciones y ante esta Curia la validez constitucional de los citados Arts. 4.001 y 4.008-A(a) y (f) de la Ley Electoral de Puerto Rico. No obs-

---

([15]) *Andrades v. Pizza Hut Mgt. Corp.*, 140 D.P.R. 950, 957 (1996).

([16]) R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. I, Cap. 47, pág. 311.

tante, el Presidente de la C.E.E. despejó cualquier tensión que pudiera existir entre la letra del estatuto y el interés público inmanente del esquema democrático de la Constitución de Puerto Rico. El *mens legis* que produjo la formulación de política pública pautada así se lo permitía. No le adscribió al incumplimiento del término y del requisito estatutario de presentar en la Unidad de Radicaciones de Candidaturas de la C.E.E. a las doce del mediodía del 1ro de agosto de 2003 el estado de situación revisado al 31 de diciembre de 2002 o, en su sustitución, copia del Informe Financiero de 2000 de la O.E.G., el carácter de fatal o de naturaleza jurisdiccional. Consideró que la falta de cumplimiento de tal requisito por parte de un aspirante a candidato a una posición electiva se tenía que evaluar a base de la presencia o no de una excusa o justificación razonable para así no hacerlo, o sea, le impartió a tal requisito el carácter de cumplimiento estricto.

La letra del estatuto claramente dispone que todo aspirante a una candidatura electiva *deberá* presentar en la C.E.E. su estado de situación revisado al 31 de diciembre del año anterior al de la fecha de presentación y bajo juramento, o en su sustitución, el Informe Financiero presentado ante la O.E.G. correspondiente al año anterior. Le adscribe a tal requisito el carácter de *principio esencial de toda candidatura*. Le concede para así hacerlo hasta el primero de agosto del año que antecede a las elecciones generales a las doce del mediodía. Dispone en forma específica y clara que si el aspirante incumple con tal requisito o condición, la C.E.E. no *"aceptará ni radicará"* la nominación. La expresión clara de la letra del estatuto en cuestión es la mejor expresión del espíritu que animó su aprobación. Su letra no se debe menospreciar bajo el pretexto de cumplir un espíritu distinto o contrario que no emana del *mens legis*. Tampoco se puede utilizar el pretexto de estar en un ejercicio de búsqueda de la armonía del estatuto en cuestión con el esquema democrático de la Constitución de

Puerto Rico cuando en el caso de autos no podemos apreciar la presencia de tensión entre el referido estatuto y el interés público que de él emana.

¿Es la Oficina de Radicaciones de Candidaturas de los partidos políticos un apéndice o una extensión de la Unidad de Radicaciones de Candidaturas de la C.E.E. para que los aspirantes cumplan con los requisitos dispuestos por los Arts. 4.001 y 4.008-A(a) y (f) de la Ley Electoral de Puerto Rico? La contestación es en la negativa. Veamos.

Al descargar nuestra función de interpretar una disposición particular de un estatuto, los tribunales debemos siempre considerar cuáles fueron los propósitos que persiguió la Asamblea Legislativa al aprobarlo, de manera que nuestra interpretación asegure la efectividad de la intención que lo anima.[17] Todo acto legislativo persigue un propósito, trata de corregir un mal, alterar una situación existente, complementar una reglamentación vigente, fomentar algún bien específico o bienestar en general, reconocer o proteger un derecho, crear una política pública o formular un plan de gobierno, entre otros. En el proceso de encontrar el significado de una ley que logre los propósitos del legislador, la interpretación se debe hacer con fines socialmente útiles.[18]

La Ley Electoral de Puerto Rico persigue un propósito específico, fomenta un bien general y, a la vez, protege derechos individuales. Persigue el propósito específico de que los procesos electorales estén revestidos de certeza, objetividad, justicia y trato igual, entre otros. Permite, además, a la C.E.E. aprobar la reglamentación y realizar la supervisión de los procesos electorales para garantizar su pureza y que se alcancen los objetivos perseguidos. Fomenta el bienestar general, pues persigue el funcionamiento armonioso de la democracia constitucional que vivimos los

---

[17] *Irizarry v. J & J Cons. Prods. Co., Inc.*, 150 D.P.R. 155 (2000); *Dorante v. Wrangler de P.R.*, 145 D.P.R. 408 (1998); *Vázquez v. A.R.PE.*, 128 D.P.R. 513 (1991).

[18] *Pueblo v. Zayas Rodríguez*, supra.

puertorriqueños. En su función de reglamentación y supervisión de los procesos electorales, protege los derechos de los individuos que aspiran a las distintas candidaturas electivas y, por ende, a aquellos que respaldan tales aspiraciones, en igualdad de términos, condiciones y requisitos.

En el proceso de encontrar el significado del estatuto en cuestión y que nuestra interpretación logre los propósitos del legislador, tenemos que descargar nuestra función normativa buscando siempre un fin socialmente útil. La C.E.E. ha determinado en casos resueltos ante sí que carece de autoridad funcional para implementar planes, comparar su funcionamiento, medir el progreso de las operaciones, la corrección de los trabajos y tomar oportunamente acción correctiva, cuando se requiera, respecto a las oficinas de radicaciones de candidaturas de los partidos políticos. La C.E.E. descarga su función dentro de la realidad de que los partidos políticos mantienen un estricto control y confidencialidad sobre su sistema de presentación de candidaturas y evaluación de aspirantes y candidatos. El Presidente de la C.E.E. no ejerce control directo ni indirecto sobre la Oficina de Radicaciones de Candidaturas de los partidos políticos y sus procesos de evaluación.[19] La letra clara del estatuto dispone que los documentos que requiere el Art. 4.001 de la Ley Electoral de Puerto Rico, *supra*, se deben presentar en o antes de la fecha y hora dispuestas por el Art. 4.008-A(a) y (f) de la Ley Electoral de Puerto Rico, *supra*, se *deben* presentar ante la C.E.E. No compartimos la óptica del Tribunal de Primera Instancia de que las Oficinas de Radicación de Candidaturas de los partidos políticos son una extensión de la C.E.E. a los fines del estatuto en cuestión. La interpretación del foro primario no sólo es contraria a la letra de la ley, sino que no alcanzó un fin socialmente útil, pues los procesos electorales tienen que estar revestidos de certeza, objetividad e igual trato a los aspirantes a candidatos. No podemos sos-

---

[19] *Edgardo Arlequín Vélez y otros*, CEE-RS-99-007.

tener lo actuado por el foro de primera instancia pues, de hacerlo, la función de reglamentación y supervisión de la C.E.E. de los procesos electorales, a tenor con el mandato legislativo, quedaría conculcada. De sostener lo actuado por el Tribunal de Primera Instancia, se neutralizaría la función revisora o de supervisión institucional de la C.E.E., colocando el proceso de presentación de candidaturas en manos de los partidos políticos y convirtiendo a la C.E.E. en un mero recibidor de documentos sin facultad para examinar, aceptar o rechazarlos.

¿Es el término y el requisito estatutario antes indicado de cumplimiento estricto o de naturaleza jurisdiccional? El referido requisito estatutario es de cumplimiento estricto. Es la única interpretación, dentro de la selección judicial que nos permite el *mens legis*, que produce un fin socialmente útil. Veamos.

Al reconocerle al referido requisito estatutario el carácter de cumplimiento estricto, permitimos a la C.E.E. descargar su ministerio en forma objetiva, justa y equitativa para todos los aspirantes. La interpretación que hoy le impartimos al presente estatuto le otorga certeza a los procesos electorales y a las actuaciones de la C.E.E. en su facultad de reglamentación y supervisión. Fomenta, además, el funcionamiento armonioso y pacífico de nuestra democracia constitucional, pues protege el interés público inmanente del magno documento.

Hemos expresado que cuando se trata de un término o requisito de cumplimiento estricto, el foro adjudicativo[20] queda liberado del automatismo que conlleva el requisito jurisdiccional y puede "proveer justicia según lo ameriten las circunstancias".[21] Cuando un término o requisito es de cumplimiento estricto, su observancia tardía "es permisible de existir y demostrarse a cabalidad una justa causa"

---

[20] En este caso, la Comisión Estatal de Elecciones.

[21] *Arriaga v. F.S.E.*, 145 D.P.R. 122 (1998); *Loperena Irizarry v. E.L.A.*, 106 D.P.R. 357 (1977).

para no cumplir rigurosamente con el término o el requisito en cuestión.[22] No se permite desviación alguna del plazo o requisito a menos que la tardanza ocurrida se justifique detalladamente y a cabalidad.[23]

Cuando en un proceso electoral se cuestiona precisamente el alcance de un término o requisito de cumplimiento estricto, la C.E.E. no goza de discreción para prorrogar el término automáticamente. La C.E.E. tiene discreción para extender un término de tal naturaleza sólo cuando la parte que lo solicita demuestra justa causa para la tardanza. En ausencia de excusa razonable o justa causa, la C.E.E. carece de discreción para prorrogar el término y, por ende, certificar la candidatura del aspirante.[24]

La C.E.E. le puede extender a un aspirante el término para cumplir con un requisito de cumplimiento estricto si están presentes dos condiciones: (1) que en efecto exista justa causa para la dilación; (2) que el aspirante demuestre detalladamente a la C.E.E. las bases razonables que tiene para la dilación, es decir, que el aspirante acredite de manera adecuada la justa causa aludida.[25]

¿Medió justa causa o excusa razonable de parte del aspirante para el incumplimiento del término y requisito de cumplimiento estricto dispuesto por estatuto? ¿Demostró detalladamente a la C.E.E. las bases razonables que tuvo para su incumplimiento? ¿Acreditó a la C.E.E. de manera adecuada su justa causa? En el presente caso no están presentes las condiciones aludidas. Veamos.

El aspirante no presentó en la C.E.E. el documento requerido en la fecha que dispone el estatuto. Presentó en la Oficina de Radicaciones de Candidaturas del P.P.D. antes

---

[22] *Arriaga v. F.S.E.*, supra; *González Santos v. Bourns P.R. Inc.*, 125 D.P.R. 48 (1989).

[23] *Arriaga v. F.S.E.*, supra; *Pueblo v. Fragoso Sierra*, 109 D.P.R. 539 (1980).

[24] *Arriaga v. F.S.E.*, supra; *Bco. Popular de P.R. v. Mun. de Aguadilla*, 144 D.P.R. 651 (1997).

[25] *Arriaga v. F.S.E.*, supra.

del 1ro de agosto de 2003 un documento que no cumplía con lo requerido por el citado Art. 4.001.

El 23 de julio de 2003 una persona se comunicó con la O.E.G. para inquirir sobre el procedimiento para solicitar una copia certificada del Informe Financiero de 2002 del aspirante. La O.E.G. orientó a esa persona sobre la necesidad de una solicitud por escrito para entregar la copia certificada del documento. El aspirante solicitó mediante carta a la O.E.G. el 23 de julio de 2003, una copia de su Informe Financiero de 2002. Ese mismo día la Sra. Vivian Sanes Ramos, directora auxiliar del Área de Auditores de Informes Financieros de la O.E.G., le cursó una carta al aspirante para informarle que las normas aplicables a ese tipo de petición requerían que el solicitante compareciera personalmente a recoger el documento requerido. Le indicaron que debía traer consigo una identificación adecuada. La O.E.G. expidió una copia certificada del documento ese mismo día. El 7 de agosto de 2003 la O.E.G. recibió una carta del aspirante en la que éste solicitó la entrega de una copia certificada de su Informe Financiero de 2002 como Alcalde del Municipio de Lares. Se le entregó la copia certificada del documento emitido desde el 23 de julio de 2003 ese mismo día, 7 de agosto de 2003, a las 3:20 de la tarde. El aspirante presentó la copia certificada en la C.E.E. el 8 de agosto de 2003 a la 4:09 de la tarde.

El aspirante presentó ante la C.E.E. una escueta declaración jurada fechada el 3 de noviembre de 2003 en la que expuso que él nunca recibió carta de la Sra. Vivian Sanes Ramos, oficial de la O.E.G., que le indicara que fuera a recoger la copia certificada de su Informe Financiero de 2002. No obstante, no demostró detalladamente a la C.E.E. el seguimiento que le impartió al trámite para obtener copia certificada del documento ante esa dependencia de gobierno en o antes del 1ro de agosto de 2003. No surge de la información que éste le brindara a la C.E.E. que dentro del período del 23 de julio de 2003 al 1ro de agosto de 2003

hubiese llamado a la O.E.G. para requerir que le entregaran la copia certificada del documento que estaba expedida desde el 23 de julio de 2003, o que hubiera visitado personalmente esa agencia o enviado a algún representante debidamente autorizado con tal propósito. El aspirante tampoco demostró detalladamente las gestiones que realizó en o antes del 1ro de agosto de 2003 para conseguir un contador público autorizado para que le preparara un informe financiero revisado al 31 de diciembre de 2002. El aspirante optó por guardar silencio sobre estos asuntos de vital importancia para que la C.E.E. pudiera determinar que éste tenía una excusa razonable o justa causa para no cumplir. No cumplió con su deber y obligación de demostrar a la C.E.E. las bases razonables para su incumplimiento. No acreditó a la C.E.E. de ninguna forma que mediara alguna justificación que le permitiera a esa agencia utilizar su discreción para extender el término. La copia certificada del Informe Financiero de 2002 de O.E.G. del aspirante se expidió el 23 de julio de 2003. No fue hasta el 7 de agosto de 2003 que el referido documento fue recogido por el aspirante en la sede de la O.E.G. No existe excusa razonable o causa justificada para su incumplimiento con el término y requisito dispuesto por ley. Con un mínimo de diligencia, el documento pudo haber sido recogido en la O.E.G. y presentado ante la C.E.E. con suficiente anticipación a la fecha y hora límites dispuestas por estatuto.

La C.E.E. ha emitido en casos similares al presente, a través de otro presidente, dictámenes que por la naturaleza de los fundamentos en que apoyó su decisión, resultan en apariencia inconsistentes con lo actuado y decidido por el actual Presidente de la C.E.E. en el caso ante nos. Por tal razón, pautaríamos la norma aquí sugerida en forma prospectiva por entender que al mediar tal situación y al no haber norma jurisprudencial clara y precisa en este

asunto, resultaría injusta su aplicación en forma retroactiva al presente caso.

## IV

Por todo lo antes expuesto, concurrimos con el resultado de confirmar la sentencia recurrida que dictó el Tribunal de Primera Instancia.